

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| FIRST PREMIER BANK, PREMIER BANKCARD, LLC AND PREMIER NEVADA, LLC, | CIV. 14 - 4055 |
| Plaintiffs, | PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION |
| VS. | |
| ODYSSEAS PAPADIMITRIOU AND EVOLUTION FINANCE, INC., | |
| Defendants. | |

## I. PRELIMINARY STATEMENT

One of a trademark owner's most important rights is its right to control how and by whom its trademark is used. When this right is violated and the mark is used in a way that is likely to cause consumers to incorrectly believe that the another business' activities are approved or associated with the trademark owner, the trademark owner's reputation and the value of its trademark can be seriously, if not permanently, damaged. The damage can be particularly severe, where, as here, the unauthorized user provides inaccurate or incomplete information regarding the trademark owner's highly regulated services.

Here, Plaintiffs First PREMIER Bank ("First PREMIER"), PREMIER Bankcard, LLC ("PREMIER South Dakota") and PREMIER Nevada, LLC's ("PREMIER Nevada") (collectively, "PREMIER") make this motion for a preliminary injunction in order to regain control of First PREMIER's trademark and the goodwill associated with that mark and the service provided under that mark. Specifically, First PREMIER, the owner of the FIRST

PREMIER mark for use in connection with credit card and other financial services, and its sister companies PREMIER Nevada and PREMIER South Dakota seek to prevent defendants Odysseas Papadimitriou and Evolution Finance, Inc. (collectively, "Defendants") from further using the FIRST PREMIER mark in connection with the promotion of third party credit card and other financial services.

Defendants are using the FIRST PREMIER mark in order to draw Internet users to their website where users can view and apply for third party credit card offers. Among other things, Defendants are using the FIRST PREMIER mark in a way that is likely to cause consumers to believe that Defendants are authorized to use that mark and otherwise have some relationship with First PREMIER. Compounding matters is that Defendants are using the FIRST PREMIER mark in connection with inaccurate and incomplete descriptions of the terms and conditions of First PREMIER's credit card services offered under the mark, which poses a danger for both PREMIER, whose advertising is highly regulated, and consumers of First PREMIER's services. Only a preliminary injunction enjoining Defendants from further use of the FIRST PREMIER mark will stem the damage to PREMIER and its business and the threat posed to consumers.

## II. STATEMENT OF FACTS

### A. **PREMIER and Its Business**

First PREMIER, which is based in Sioux Falls, South Dakota, is an issuer of credit cards and provider of other financial services. (McCord Dec., ¶2).[1] First PREMIER provides its services under the name and mark FIRST PREMIER. Pursuant to an agreement between First PREMIER and PREMIER Nevada, PREMIER South Dakota and PREMIER Nevada service and market credit cards on behalf of First PREMIER using the FIRST PREMIER mark. First

---

[1] Citations to the "McCord Dec." refer to the Declaration of Anthony McCord, production manager for PREMIER Bankcard, LLC, submitted herewith.

2

PREMIER, PREMIER South Dakota and PREMIER Nevada are sister companies owned by United National Corporation. (*Id.*)

PREMIER South Dakota, which is responsible for First PREMIER's Internet marketing, uses the FIRST PREMIER mark pursuant to an agreement with PREMIER Nevada, which has rights to the FIRST PREMIER mark pursuant to an agreement with First PREMIER. (*Id.* at ¶3).

Since 1989, PREMIER's primary purpose has been to provide individuals with damaged credit histories an avenue to obtain credit through the use of a credit card to help them demonstrate positive financial patterns. PREMIER's goal is to help these individuals receive a second chance when it comes to their finances. So that these individuals are not placed in a position to further hinder their financial progress, the credit limits on the credit cards issued to them are kept low, usually around $300. PREMIER is one of the top twenty issuers of VISA® and MasterCard® credit cards in the country serving millions of customers nationwide. (*Id.* at ¶4).

PREMIER South Dakota promotes First PREMIER's credit card services via the Internet. Some of these promotional activities are conducted by Internet marketers known as affiliates. Affiliates place Internet advertisements for third parties such as PREMIER South Dakota. These advertisements can take the form of banner ads placed by affiliates on third party websites as well as promotional websites operated by the affiliates themselves. Regardless of the type of advertisement, when an Internet user clicks on one of PREMIER South Dakota's affiliate's advertisements, the user is directed to an application for First PREMIER's credit cards. Typically, for each Internet user that clicks on an affiliate's ad and, after being directed to First PREMIER's application, completes and submits the application, PREMIER South Dakota pays that affiliate a fee. (*Id.* at ¶5).

The use of third parties such as Internet affiliates to promote credit card and other bank services is regulated by several federal agencies. These agencies include the Office of the Comptroller of the Currency ("OCC"), the Federal Reserve and the Consumer Financial Protection Bureau ("CFPB") (collectively the "Regulatory Agencies"). The Regulatory Agencies require banks, such as PREMIER, which use third parties to promote their products, to, among other things, conduct proper due diligence in selecting a third party and engage in ongoing monitoring of the third party's activities and performance. The Regulatory Agencies have detailed regulations governing, among other things, the accuracy of disclosures contained in a bank's Internet advertising. (*Id.* at ¶6).

PREMIER diligently strives to fully comply with these regulatory obligations. Among other things, PREMIER South Dakota conducts thorough due diligence with respect to its Internet affiliates and actively monitors their activities and performance. In addition, PREMIER South Dakota reviews and approves all of its affiliates' advertising copy before the affiliates use the copy for marketing purposes. PREMIER South Dakota does this in order to ensure that its affiliates' advertising complies with all applicable regulations. (*Id.* at ¶7).

PREMIER South Dakota, as with all other financial institutions, is regularly examined by a number of state and/or federal agencies. These examinations usually include a review of PREMIER South Dakota's business relationships with third parties like Internet affiliates. In addition, the CFPB and the Federal Reserve can review a financial institution's advertising. If an examination or review reveals that the financial institution is not fully complying with regulations governing relationships with third parties or Internet advertising, the financial institution could be subject to fines and other disciplinary action. (*Id.* at ¶8).

First PREMIER owns United States Trademark Registration No. 3,108,850 for FIRST PREMIER for banking services, credit card services, and treasury management services. This registration is valid, subsisting and incontestable. (*Id.* at ¶9). A true and correct copy of this registration from the United States Patent and Trademark Office's Internet database is attached to the Declaration of Anthony McCord as Exhibit 1.

Credit card and financial services offered in connection with the FIRST PREMIER mark are widely recognized by consumers to be of the highest quality, which are offered and sold under superior customer service conditions. As a result thereof, the FIRST PREMIER mark and the goodwill associated therewith are of inestimable value to FIRST PREMIER. (McCord Dec., ¶10). By reason of the distinctiveness of the FIRST PREMIER mark, this trademark indicates to customers, potential customers and the trade that credit card and financial services offered in connection with the FIRST PREMIER mark are offered and provided by PREMIER. (*Id.* at ¶11).

By virtue of the wide renown acquired by the FIRST PREMIER mark coupled, the significant promotion of services provided under the FIRST PREMIER mark, of the widespread use of FIRST PREMIER credit cards and the significant amount of sales under that mark, the FIRST PREMIER mark has become famous and has developed a secondary and distinctive meaning and significance in the minds of the trade and the relevant purchasing public, such that credit card and financial services offered under or in connection with this trademark are immediately identified by the purchasing public with FIRST PREMIER. (*Id.* at ¶12).

### B. Defendants' Illegal Conduct

Upon information and belief, defendants Odysseas Papadimitriou and Evolution Finance, Inc. ("Evolution") own and operate the website with the web address of www.cardhub.com (the

"Accused Website"). According to the WhoIs information for the cardhub.com domain name, Mr. Papadimitriou owns that domain name. Upon information and belief, Mr. Papadimitriou owns Evolution, is its Chief Executive Officer, is Evolution's sole employee and exclusively controls its actions. (*Id.* at ¶13). A true and correct copy of the WhoIs information for the cardhub.com domain name is attached to the Declaration of Anthony McCord as Exhibit 2.

At times between June 2008 and January 2011, Evolution was one of PREMIER South Dakota's Internet affiliates. During that time, Evolution promoted First PREMIER's FIRST PREMIER and other credit cards. The relationship between Evolution and PREMIER South Dakota was governed by an Internet Marketing Agreement dated June 15, 2008 (the "Agreement"). (McCord Dec., ¶14). A true and correct copy of the Agreement is attached to the Declaration of Anthony McCord as Exhibit 3.

Before Evolution became one of PREMIER South Dakota's Internet affiliates, PREMIER South Dakota conducted the required diligence on that entity. During the time that Evolution was one of PREMIER South Dakota's affiliates, PREMIER South Dakota engaged in the required ongoing monitoring of Evolution's activities and performance. (McCord Dec., ¶15). PREMIER South Dakota terminated its relationship with Evolution for good on January 3, 2011, with a termination effective date of January 15, 2011. (*Id.* at ¶16).

During the time that it was an affiliate of PREMIER South Dakota, Evolution's primary marketing activity on behalf of PREMIER South Dakota was to promote First PREMIER's credit card services on the Accused Website. During that time, when Internet users clicked on a link on the Accused Website, a banner ad for FIRST PREMIER credit cards would appear. These banner ads contained links to an application for FIRST PREMIER credit cards, which the Internet user could then complete and submit. (*Id.* at ¶17).

6

The Agreement defined "Banner" as "a graphic message and any other information that appears in the screen when accessing [Evolution's] Website, or a graphic message that appears in a Link, "pop-up" advertisement or exit console, promoting [First PREMIER's] credit card products or directing Traffic to PREMIER's website." (*Id.* at ¶18). The banner ads used by Defendants contained links to an application for FIRST PREMIER credit cards, which the Internet user could then complete and submit. (*Id.* at ¶19). Pursuant to Section 10.B. of the Agreement, Defendants, upon the termination of the Agreement, were required to remove from the Accused Website all banner ads promoting First PREMIER. (*Id.* at ¶17).

At all relevant times, Defendants' Accused Website was and continues to be a marketing website designed to promote the products and services of the businesses to which Evolution acts as an affiliate. The products and services include credit cards, prepaid debit cards and gift cards. (*Id.* at ¶20). Among other things, the Accused Website contained and continues to contain links to third party websites where Internet users can apply for or purchase the products promoted on the Accused Website. Upon information and belief, Evolution is typically compensated when an Internet user clicks on one of these links and applies for or purchases a product or service promoted on the Accused Website. (*Id.* at ¶21). True and correct copies of relevant portions of the Accused Website are attached to the Declaration of Anthony McCord as Exhibit 4.

After PREMIER South Dakota terminated the Agreement in January 2011, Evolution, upon information and belief, at the direction of Mr. Papadimitriou, continued to promote First PREMIER's credit cards on the Accused Website, often using banner ads (as that term is defined in the Agreement) and unauthorized copies of First PREMIER's registered trademark and unauthorized images of actual First PREMIER credit cards bearing First PREMIER's registered trademark. (McCord Dec., ¶22).

By letter dated July 8, 2011, PREMIER South Dakota put Defendants on notice of their infringing conduct. (*Id.* at ¶23). A true and correct copy of the July 8, 2011 letter is attached to the Declaration of Anthony McCord as Exhibit 5. After an exchange of correspondence between Defendants and PREMIER South Dakota's attorneys, Defendants appeared to cease their infringing conduct. (McCord Dec., ¶23).

In August 2012, PREMIER South Dakota learned that Defendants were again infringing First PREMIER's trademarks on the Accused Website. By letter dated August 29, 2012, PREMIER South Dakota again put Defendants on notice of their infringing conduct. (*Id.* at ¶23). A true and correct copy of the August 29, 2012 letter is attached to the Declaration of Anthony McCord as Exhibit 6. Again, after an exchange of correspondence between Defendants and PREMIER South Dakota's attorneys, Defendants appeared to cease their infringing conduct. (McCord Dec., ¶24).

In November 2012, PREMIER South Dakota learned that Defendants were again infringing First PREMIER's trademarks on the Accused Website. By letter dated November 20, 2012, First PREMIER again put Defendants on notice of their infringing conduct. (*Id.* at ¶25). A true and correct copy of the November 20, 2012 letter is attached to the Declaration of Anthony McCord as Exhibit 7. Again, after an exchange of correspondence between Defendants and PREMIER South Dakota's attorneys, Defendants appeared to cease their infringing conduct. (McCord Dec., ¶25).

Recently, PREMIER South Dakota learned that Defendants have resumed infringing First PREMIER's trademarks on the Accused Website. (*Id.* at ¶26). Among other things, Defendants, without authorization, are Promoting FIRST PREMIER credit cards through banner ads (as that term is defined in the Agreement) appearing on the Accused Website even though PREMIER has

no relationship with Defendants. All of these unauthorized promotions have "Apply Now" buttons which direct Internet users to a genuine online application form for a FIRST PREMIER credit card. (*Id.* at ¶27). True and correct examples of the unauthorized promotions for FIRST PREMIER currently displayed on the Accused Website are attached to the Declaration of Anthony McCord as Exhibit 8.

The unauthorized promotions for FIRST PREMIER credit cards on the Accused Website provide descriptions of those credit cards and relevant terms including APR's, late and other fees, cash advance rates and credit limits. Pursuant to CFPB regulation, 12 CFR § 1026.16, if an advertisement for a for a credit card contains information about fees or rates associated with the credit card, the advertisement must contain the full terms and conditions of the credit card or contain a link to a web page where the full terms and conditions can be found. The information regarding FIRST PREMIER credit cards on the Accused Website does not set forth the full terms and conditions of the credit card or contain a link to a web page where the full terms and conditions can be found. In addition, depending upon the offers being run by First PREMIER at any given time, the information on the Accused Website regarding FIRST PREMIER credit cards can be incomplete, inaccurate or simply wrong. (McCord Dec., ¶28).

PREMIER South Dakota has created an intermediary landing page for Internet users directed to a FIRST PREMIER application from unauthorized websites such as the Accused Website. This landing page encourages users to review the terms and conditions of the FIRST PREMIER credit card and provides a link to a FIRST PREMIER credit card application, where full terms and conditions can be accessed. Nevertheless, there is a risk that Internet users will incorrectly believe that the information on the Accused Website regarding FIRST PREMIER

credit cards is complete and accurate and apply for a FIRST PREMIER credit card based on this incorrect belief. (*Id.* at ¶29).

The unauthorized promotions for FIRST PREMIER credit cards on the Accused Website contain a Q&A feature which enables users to submit questions about the FIRST PREMEIR credit card being promoted. PREMIER plays no role in and has no control over the answers given to users' questions submitted through this feature. (*Id.* at ¶30). The unauthorized promotions for FIRST PREMIER credit cards on the Accused Website also contain a "review" feature. The Accused Website does not contain the appropriate disclaimers stating that PREMIER did not create nor is responsible for the content found in the reviews. Such a disclaimer is considered a "best practice" to ensure that consumers know that any non-credit card offer related information is not associated with PREMIER. (*Id.* at ¶31).

Because Evolution is not an affiliate of PREMIER South Dakota, PREMIER South Dakota has not conducted due diligence on Evolution in a number of years nor has it engaged in ongoing monitoring of Evolution's activities and performance. The promotions for FIRST PREMIER on the Accused Website have not been reviewed by PREMIER South Dakota to ensure compliance with CFPB regulations. (*Id.* at ¶32).

PREMIER is concerned that Defendants' unauthorized and inaccurate promotions of FIRST PREMIER's products and services may trigger a review of PREMIER's advertising by the CFPB as well as invite the scrutiny of the Federal Reserve and the OCC. All of this would be highly disruptive to PREMIER's business. (*Id.* at ¶33). Since PREMIER has not had any relationship with Evolution since January 2011, Defendants are not realizing any direct monetary gains through their unauthorized conduct. (*Id.* at ¶34).

However, upon information and belief, because FIRST PREMIER credit card products can be considered a major, well-known brand, and because consumers have very limited options for sub-prime credit cards, the placement of promotions for FIRST PREMIER credit cards on the Accused Website can result in increased Internet traffic to the Accused Website from Internet users searching for FIRST PREMIER and/or sub-prime credit cards. (*Id.*). In addition, upon information and belief, the "Apply Now" links to FIRST PREMIER credit cards on the Accused Website help cause the Accused Website to be ranked higher by search engines, i.e., towards the top of the search results page, particularly when a user conducts a search for FIRST PREMIER. (*Id.* at ¶35).

## III. ARGUMENT

### Premier Is Entitled To A Preliminary Injunction

It is well settled that "whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). The issuance of an injunction "depends upon a 'flexible' consideration" of these factors. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 729 n.3 (8th Cir. 2008). Injunctive relief is the preferable remedy in a case involving infringement of trademark rights, as there is no adequate remedy at law for injury arising from an ongoing infringement. *General Motors LLC v. Rapp Chevrolet, Inc.*, Case No. CIV. 12-4209 (RAL), 2013 WL 2245472 (D.S.D. May 21, 2013).

For the reasons set forth herein and in the accompanying McCord Declaration, PREMIER has established its entitlement to a preliminary injunction.

### A.  PREMIER Will Suffer Irreparable Injury If a Preliminary Injunction is Not Granted

When unfair competition is alleged, irreparable injury is established by a showing that plaintiff has no control over defendants' use of its trademark. *KTM North America, Inc. v. Cycle Hutt, Inc.,* No. CIV. 13-5033 (JLV), 2013 WL 1932797, at *7 (D.S.D. May 8, 2013) ("[b]ecause of Plaintiff's inability to control defendants' business practices, 'the actual quality of defendants' services constitutes an immediate and irreparable injury, regardless of the quality of those services.'") (quoting *Sturgis Area Chamber of Commerce v. Sturgis Rally & Races, Inc.*, 99 F. Supp. 2d 1090, 1101 (D.S.D. 2000)); *see also Community of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1012 (8th Cir. 2011) (finding irreparable injury based on unauthorized use of plaintiff's registered marks).

Here, First PREMIER owns a registered, incontestable trademark, which Defendants copied and employed in connection with the promotion of third party services on the Accused Website. Since January 2011, Defendants have not been authorized to use the FIRST PREMIER mark in connection with promoting and advertising credit card or any other services or to post banner ads (as that term is defined in the Agreement) on the Accused Website featuring the FIRST PREMIER mark. (McCord Dec., ¶16).

Because Evolution is not an affiliate of PREMIER South Dakota, neither PREMIER South Dakota nor any of the other Plaintiffs can conduct ongoing monitoring of Defendants' activity and performance. (*Id.* at ¶32). Plaintiff therefore cannot ensure that the Defendants advertising is accurate or complies with applicable regulations. As set forth above, the statements on the Accused Website describing First PREMIER's services are in violation of 12 CFR § 1026.16, the CFPB's regulation regarding the advertising of credit card services because

the Accused Statement do not contain the full terms of the credit card offer or a link to those terms. In addition, the terms are often inaccurate.

PREMIER made several attempts to cause Defendants to cease their illegal conduct. While each attempt appeared to result in a temporary cessation of the illegal activity, Defendants have again resumed such activities. (*Id.* at ¶¶23-25). It is thus apparent that Defendants' intend to persist in their unauthorized use of the FIRST PREMIER mark, a use that PREMIER has no ability to control or monitor. As such, Defendants' continued use of Plaintiff's marks will cause irreparable harm to Plaintiff in the absence of the requested injunctive relief.

### **PREMIER Is Likely to Succeed On the Merits of This Action**

The Complaint in this action asserts three causes of action: (i) unfair competition under section 43(a) of the Lanham Act, (ii) common law unfair competition and (iii) breach of contract. Plaintiff is likely to succeed on each of its claims.

Plaintiff is likely to succeed on the merits of its claim for unfair competition. Pursuant to Section 43(a) of the Lanham Act:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. 1125(a).

To prevail on a claim under section 43(a), "plaintiff must prove that defendants' use of the [mark] creates a likelihood of confusion, deception, or mistake among an appreciable number of ordinary buyers as to the source of or association between the two [marks]." *Gateway Inc. v.*

13

*Companion Prods., Inc.*, 320 F.Supp.2d 912, 924 (D.S.D. 2002) (quoting *Duluth News-Tribune, a Div. of Nw. Publ'ns, Inc. v. Mesabi Publ. Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996)). "The likelihood of consumer confusion is the 'hallmark of any trademark infringement claim.'" *Id.* at 924 (quoting *Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1308 (8th Cir. 1997)).[2]

"To determine the likelihood of confusion between the trademarks and the allegedly infringing marks, [courts] consider the following factors ... : 1) the strength of the trademark owner's mark; 2) the similarity between the trademark owner's mark and the alleged infringing mark; 3) the degree to which the allegedly infringing services competes with the trademark owner's services; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers; and 6) evidence of actual confusion." *Community of Christ Copyright Corp.*, 634 F.3d at 1009 (citing *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)). "No one factor controls, and because the inquiry is inherently case-specific, different factors may be entitled to more weight in different cases." *Community of Christ Copyright Corp.*, 634 F.3d at 1009 (internal quotations omitted).

In "a situation where [as here] the wrongdoer used the plaintiff's actual mark, not merely a similar mark ... [f]ew are the cases demonstrating a more obvious and imminent likelihood of confusion" *Mid-List Press v. Nora*, 374 F.3d 690, 693 (8th Cir. 2004) (internal quotations omitted) (stating that it would be "hard-pressed to imagine what [other] effect these actions could possibly have"). Under the Lanham Act, "actual consumer confusion" is not a necessary

---

[2] "The same set of facts in support of a suit for infringement of a trademark is looked for as in one for unfair competition." *Heaton Distrib. Co. v. Union Tank Car Co.*, 387 F.2d 477, 483 (8th Cir. 1967) (citations omitted). That is because "[t]rademark infringement is but a part of the broader law of unfair competition, and facts supporting a suit for infringement and one for unfair competition are substantially identical." *Id.* (citations omitted).

element, and "proof of likelihood of confusion is all that is required to obtain injunctive relief." *Id.*

### 1. The FIRST PREMIER Mark is Strong.

Here, First PREMIER owns incontestable United States Trademark Registration No. 3,108,850 for FIRST PREMIER for banking services, credit card services, and treasury management services. This registration is valid, subsisting and incontestable. As a result of many years of use and business success under this mark, the FIRST PREMIER mark is famous and has acquired distinctive, secondary meaning. (McCord Dec. ¶¶10-12). The FIRST PREMIER mark is therefore strong.

### 2. Defendants are Using First PREMIER's Actual Mark.

It appears that Defendants are employing the actual FIRST PREMIER mark in a deliberate attempt to confuse the public into believing that the Accused Website is operated by an approved affiliate of or otherwise is associated with PREMIER. As a result of receiving at least three cease and desist letters in the past, Defendants know that their use of the FIRST PREMIER mark is not sanctioned by PREMIER. Indeed, the Agreement, which was signed by Mr. Papadimitriou, specifically requires Evolution to cease using posting banner ads (as that term is defined by the Agreement. (*Id.* at ¶17). Thus, Defendants actions are deliberate and with full knowledge of the fact that the public is likely to be confused by their unauthorized use of the FIRST PREMIER mark.

### 3. Defendants are in Competition with PREMIER and Intend to Confuse the Public.

It appears that Defendants are using the FIRST PREMIER mark on the Accused Website and placing banner ads featuring the FIRST PREMIER mark in an effort to create a false impression that the Accused Website presents more credit card options than it actually does and

15

to give the Accused Website higher search engine rankings. Because the Accused Website solicits potential consumers of third party credit cards and provides the public with the ability to apply for third party credit cards by serving as a credit card application portal and because third parties pay Evolution for these services, Defendants, are in direct competition with Plaintiff.

### 4. The Degree of Consumer Care is Not High

While consumers do employ some degree of care when applying for credit cards, they are still likely to be confused by Defendants use of FIRST PREMIER mark. That is because the mark is being used in connection with information, *albeit incomplete and potentially inaccurate information,* of the services First PREMIER provides under that mark and conjunction with an "Apply Now" button which links users to a genuine application for a FIRST PREMIER credit card. (*Id.* at ¶27). All of this signals to consumers that there is an affiliation between PREMIER and Defendants when none exists.

### 5. PREMIER is Likely to Succeed on Its State Law Unfair Competition Claim.

A claim for unfair competition under South Dakota law "lack[s] specific elements ... Instead, the claim encompasses 'a general category of torts which courts recognize for the protection of commercial interest.'" *Jones v. Haglin*, Case No. CIV. 11-1012, 2012 WL 135449, at *4 (quoting *Setliff v. Akins,* 616 N.W. 2d 878, 887 (Sup. Ct. S.D. 2000)) (D.S.D. Jan. 17, 2012). Here, unfair competition is established upon a showing of the underlying trademark infringement. *Gateway*, 320 F. Supp. 2d at 926. As set forth above, Defendants have used Plaintiff's actual registered mark in a deliberate attempt to confuse consumers. Defendants have done so for the purpose of gaining additional traffic on the Accused Website thereby increasing their ability to market and sell the third party credit cards promoted on the Accused Website.

### 6. PREMIER South Dakota is Likely to Succeed on Breach of Contract Claim.

Under South Dakota law, breach of contract requires: "(1) an enforceable promise; (2) a breach of the promise; and, (3) resulting damages." *Bowes Constr., Inc. v. South Dakota Dept. of Transp.*, 793 N.W.2d 36, 43 (Sup. Ct. S.D. 2010). Pursuant to Section 10.B. of the Agreement, Evolution agreed that upon the termination of the Agreement, it would remove from the Accused Website all banner ads promoting First PREMIER. (McCord Dec., ¶17). After PREMIER South Dakota terminated the Agreement in January 2011, Evolution, at the direction of Mr. Papadimitriou and in violation of the Agreement, promoted and continues to promote First PREMIER's credit cards on the Accused Website, using "banner" ads as that term is defined in the Agreement. (*Id.* at ¶22). Defendants are placing these banner ads in violation of applicable regulations and have deprived PREMIER of the ability to monitor and control its Internet advertising.

For the reasons set forth above, there is a strong likelihood that PREMIER will succeed on the merits of all of its claims.

### B. The Balance of Harm Weighs in Favor of an Injunction

"[T]he balance of harm analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public." *KTM North America*, 2013 WL 1932797, at *8 (citing *Dataphase*, 640 F.2d at 114) (internal quotation and citation omitted).

Here, as in *KTM*, "Plaintiffs are not seeking to put defendants out of business by enjoining their use of the [Plaintiff's] mark." *KTM North America*, 2013 WL 1932797, at *8 ("all plaintiffs seek to enjoin is defendants' use of the KTM mark and the use of 'KTM' in any website domain name. While a TRO may well restrict defendants' business, prohibiting their use

of the KTM mark and 'KTM' in any website domain name will not necessarily put defendants out of business. There is no harm to defendants by enjoining their unlawful use of plaintiffs' trademarks.") The *KTM* court recognized that "there is a vast market for [defendants' services] without violating plaintiffs' legal rights." *Id.* As such, the only harm to Defendants in issuing an injunction is the inability to continue their unauthorized use of the FIRST PREMIER mark. Defendants can still continue to operate the Accused Website, but they will have to do so without causing confusion with respect to PREMIER's services.

In contrast, the harm to PREMIER and consumers is great. PREMIER risks damage to its reputation and goodwill as well as investigations and enforcement actions of the OCC, Federal Reserve and the CFPB arising out of Defendants' use of incomplete inaccurate and unauthorized information describing FIRST PREMIER credit cards. Consumers risk applying for and obtaining these credit cards based on this incomplete and/or inaccurate information.

Accordingly, the balance of the harms weighs in favor of granting PREMIER's requested injunctive relief.

### C. Public Interest

The public interest factor weighs in favor of PREMIER based on the showing of likelihood of confusion. *KTM North America*, 2013 WL 1932797, at *8 ("Once the likelihood of confusion is shown, it follows that the public interest is damaged if such confusion continues) (citing *Sturgis Area Chamber of Commerce v. Sturgis Rally & Races, Inc.*, 99 F. Supp. 2d 1090, 1102 (D.S.D. 2000) and J. Thomas McCarthy, *5 McCarthy on Trademarks and Unfair Competition*, § 30.52 (4th Ed.1997)). "It is in the public's interest to prevent unlawful trademark infringement and to avoid deceit or confusion in the market place." *Id.* at *8.

The public interest is particularly strong here given the risk that consumers will apply for and obtain FIRST PREMIER credit cards based on the incomplete and/or inaccurate information presented on the Accused Website.

Accordingly, the public interest factor weighs in favor of granting Plaintiffs' requested injunctive relief.

## IV. CONCLUSION

For the foregoing reasons, and for the reasons set forth in the Complaint and the Declaration of Anthony McCord, it is respectfully submitted that Plaintiffs' motion for a preliminary injunction should be granted.

Dated: April 10, 2014

CADWELL SANFORD DEIBERT
& GARRY, LLP

By /s/ James Simko
James S. Simko
200 East 10th Street, Suite 200
P.O. Box 1157
Sioux Falls, SD  57101-1157
Tel.  605-336-0828


Mark J. Rosenberg
(*pro hac vice* admission pending)
TARTER KRINSKY & DROGIN LLP
1350 Broadway
New York, New York 10018
Tel.  212-216-1127