**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

**JAN 07 2015**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| FIRST PREMIER BANK, PREMIER BANCKARD, LLC and PREMIER NEVADA, LLC, | CIV 14-4055 |
| Plaintiffs, | MEMORANDUM OPINION ON MOTION FOR PRELIMINARY INJUNCTION AND MOTION TO DISMISS |
| vs. | |
| ODYSSEAS PAPADIMITRIOU and EVOLUTION FINANCE, INC., | |
| Defendants. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiffs, a bank and issuers of sub-prime credit cards, brought this case against Evolution Finance and its founder and CEO, Odysseas Papadimitriou, owners and operators of an Internet credit card review website called CardHub. The Complaint asserts three causes of action: (1) unfair competition under section 43(a) of the Lanham Act, (2) state common law unfair competition and (3) breach of contract. Plaintiffs First Premier Bank, Premier Banckard, LLC and Premier Nevada, LLC move for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Arguments on both motions were heard on October 30, 2014, in Sioux Falls, South Dakota. Plaintiffs asked the Court to permit evidence to be submitted in advance of the hearing by affidavit in order to expedite the proceedings. For the reasons set forth below, both motions are denied.

### FINDINGS OF FACT

First Premier, which is based in Sioux Falls, South Dakota, is a provider of financial services and an issuer of credit cards. First Premier owns a registered trademark for its services. Using the First Premier mark, Premier South Dakota markets First Premier's sub-prime credit cards to consumers with bad credit through Internet marketers called "affiliates" that carry First Premier

banner advertisements. When an Internet user clicks on one of Premier's affiliate's advertisements, the user is directed to an application for First Premier's credit cards. Typically, Premier South Dakota compensates its affiliates for each application submitted through the affiliate's ad. Premier South Dakota reviews and approves all of its affiliates' advertising before it is used for marketing purposes in order to ensure that it complies with all applicable federal regulations for banks.

Defendant Odysseas Papadimitriou is the founder and Chief Executive Officer of Evolution Finance, the parent company of CardHub.com, a website that helps consumers learn about and compare credit cards. CardHub's database of over 1,200 credit cards includes information such as the interest rate, fees, and rewards for each card. In addition, CardHub users are encouraged to review and rate each credit card, and their input is presented on the website. CardHub does not issue credit cards. During the relevant period, the "about" page of the website included a disclaimer that "CardHub is not a credit-card company, nor are we the front for any credit-card company. We are, however, committed to helping each and every CardHub customer make better financial decisions regarding the cards in their wallets."

To pay for the expenses associated with maintaining the website, credit card companies that become advertisers on CardHub pay a commission for each credit card application completed by an individual who clicks on an "Apply Now" link on CardHub. In return, advertisers' cards are given priority placement on certain pages throughout CardHub. Every card offered by paying advertisers is clearly labeled "Sponsored Card" on the CardHub website. But if a consumer clicks on a card that happens to *not* be sponsored, such as First Premier, that lack of sponsorship is not indicated. The details page for every card in the CardHub database includes a disclaimer which states, in relevant part:

> Regardless of advertiser status, none of the information on CardHub constitutes a referral or endorsement of the respective issuer by us, or vice versa. Furthermore, it is important to note that the inclusion of non-sponsored cards on CardHub does not indicate that issuer's involvement with the site. Information is displayed first and foremost for helping consumers make better credit card decisions.

2

Papadimitriou Decl. ¶ 17.  Every link from CardHub to a credit card's website brings users first to a special page that informs them they are leaving the CardHub site and are being redirected to the credit-card company's site.  Plaintiffs claim this special page suggests a relationship between Defendants and First Premier.

On June 15, 2008, First Premier and Evolution Finance entered into an Internet marketing agreement (Agreement).  First Premier provided CardHub with banner ads, credit-card images, marketing bullet points and a special tracking hyperlink.  When clicked, the hyperlink took the user to an application for First Premier credit cards, which could then be completed and submitted.  The hyperlink also recorded on First Premier's servers that the visitor had come from CardHub.  If the user signed up for a card, CardHub would receive an $8.50 commission from First Premier.

On January 3, 2011, Premier South Dakota terminated the Agreement with CardHub. CardHub claims that it removed all of the banner ads, credit-card images, marketing bullets, special tracking link and other media that had been given to CardHub as part of the Agreement, and that the CardHub pages for First Premier cards were restored to non-affiliate data like that kept about all other major credit cards.  The special hyperlink was replaced with a standard link to First Premier.

First Premier claims that Evolution continued to promote First Premier credit cards on CardHub, sometimes using banner ads and unauthorized copies of First Premier's registered trademark.  Premier South Dakota sent letters to Defendants on July 8, 2011, August 29, 2012 and November 20, 2012, accusing them of infringing First Premier's trademark on the CardHub website. The parties were able to work through their disputes until early 2014 when CardHub updated its website to make the site easier to view on handheld devices such as phones and tablets.  In the process, CardHub's engineers unintentionally discarded the special code that had been set up to hide the special links directly to First Premier's credit card application.  Thus, the CardHub website again had "Apply Now" buttons which directed Internet users to an online application form for a First Premier credit card.  Plaintiffs claim that "Apply Now" or "Apply Here" buttons on CardHub's

3

website that direct the consumer to the First Premier transactional or application page confuse consumers, causing them to believe CardHub is affiliated with First Premier.

On April 10, 2014, Plaintiffs filed this lawsuit alleging breach of contract and unfair competition under the Lanham Act and the common law. The same day the complaint was filed, Plaintiffs filed a motion for preliminary injunction. Plaintiffs seek to enjoin Defendants from:

(a) Appropriating and using the FIRST PREMIER name and mark for commercial purposes;

(b) Using the FIRST PREMIER mark or any colorable imitation thereof in connection with offering, selling, advertising or promoting the sale of any goods or services or from otherwise using any name or mark confusingly similar thereto;

(c) Infringing the FIRST PREMIER mark, and unfairly competing with PREMIER;

(d) Placing on the Accused Website or any other website that is directly or indirectly owned, operated or controlled by Defendants graphic messages and any other information that appears in the screen when accessing that website, or a graphic message that appears in a link, "pop-up" advertisement or exit console appearing on such website that promotes First PREMIER's credit card products, directs Internet users to web sites where persons can apply for First PREMIER's credit card products or directs Internet traffic to PREMIER's websites;

(e) Using in connection with the sale of any goods or services or the dissemination or distribution of advertising, promotional or marketing materials, a false or misleading description or representation including words or other symbols tending to deceive or cause confusion with PREMIER or the FIRST PREMIER mark; and

(f) Breaching Section 10.B of the June 15, 2008 agreement between PREMIER South Dakota and defendant Evolution Finance, Inc.

(Doc. 4.)

Within days of learning of the lawsuit, Mr. Papadimitriou had the "Apply Now" links removed. Plaintiffs do not object to CardHub's continued maintenance of basic information about First Premier's credit cards. Plaintiffs' lawyer explained that the Amended Complaint was filed on August 28, 2014, to clarify that Plaintiffs are not seeking to preclude any criticism or commentary about First Premier on CardHub's website, or even the use of Premier's mark; Plaintiffs seek solely

to stop CardHub's use of the "Apply Now" buttons to link consumers directly to an application for a First Premier credit card.[1]  Plaintiffs frame their trademark infringement claim as follows:

> The issue is whether Defendants' use of the First Premier mark in connection with the Accused Links which link to First Premier's application page are likely to cause consumers to believe that Defendants are affiliated with, connected with, or sponsored by Premier.  Given that (i) the Accused Links link to First Premier's application page, *i.e.*, the page where a transaction between the consumer and First Premier takes place, and Defendants use the First Premier mark in connection with the Apply Now and Apply Here buttons in the exact same way that they use those buttons and the marks of Defendants' advertisers, consumers are likely to believe that the parties and their respective services are "affiliated in some way."

(Doc. 35, Reply Brief at 10.)  Plaintiffs agree that no trademark infringement results from Defendants' of use the First Premier mark to refer to or identify Premier products, but Plaintiffs assert that the "Apply Now" or "Apply Here" buttons suggest a relationship in which Premier compensates Defendants for each consumer who submits an application to First Premier.  According to Mr. Papadimitriou, in the six years the company has been operating, no other credit-card company has demanded that links to their site be removed.  CardHub continues to link to the websites of "virtually every other major credit card in the United Sates."  (Doc. 47-1, ¶ 4.)  In a supplemental declaration of Mr. Papadimitriou filed the day before the hearing, he stated that "CardHub has *never* linked to an 'application page' on First Premier's website.  CardHub has only linked to purely informational landing pages controlled entirely by First Premier."  (Doc. 47-1, ¶ 2.)  Mr. Papadimitriou believes the company has a right to provide a link to First Premier's website, but he has tried to accommodate First Premiere's requests not to do so.

At the hearing on the motion for preliminary injunction on October 30, 2014, Plaintiffs admitted that Defendants were no longer causing any confusion over the First Premier trademark

---

[1]     Paragraph 38 of the Amended Complaint explains that Premier South Dakota has created an intermediary landing page for Internet users directed to a First Premier application from unauthorized websites such as CardHub.  The landing page encourages users to review the terms and conditions of the First Premier credit card and provides a link to a First Premier card application, where the full terms and conditions can be accessed.  At oral argument, counsel for Plaintiffs stated that the intermediary landing page was created due to Defendants' conduct.

because the "Apply Now" and "Apply Here" buttons with direct links to a First Premier card transaction page had been removed. Defendants agreed not to put the link back up while this lawsuit is pending, but they did not promise to keep the links off the CardHub website after this case is resolved. Plaintiffs still request injunctive relief, however, because they fear Defendants will reinstate the "Apply Now" links in order to make the CardHub website more functionally attractive. Plaintiffs admit that Defendants are not realizing any direct monetary gains by through their conduct but allege that Defendants benefit from a more functionally attractive website if the "Apply Now" links are used. According to Plaintiffs, Defendants' conduct damages the good will of Plaintiffs' customers, and it might trigger scrutiny of First Premier by federal regulatory agencies.

At the conclusion of the hearing, the parties agreed that the pending motions can be decided on the record submitted before the Court.

## CONCLUSIONS OF LAW

### I. Motion for Preliminary Injunction

In determining whether to grant a preliminary injunction a court considers (1) the probability of the movant's success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of the preliminary injunction is in the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). The plaintiff bears the burden of proof concerning the four factors. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). The court balances the four factors to determine whether a preliminary injunction is warranted. *Dataphase*, 640 F.3d at 113; *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986). "A district court has broad discretion when ruling on preliminary injunction requests[.]" *Coca–Cola Co. v. Purdy*, 382 F.3d 774, 782 (8th Cir. 2004) (citing *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)).

## A. Lanham Act Claim

Plaintiffs assert a cause of action for unfair competition under 15 U.S.C. § 1125(a).[2] The Lanham Act "prohibits the use of a mark in connection with goods or services in a manner that is likely to cause confusion as to the source or sponsorship of the goods or services." *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005) (citing 15 U.S.C. § 1125(a)(1)). This includes confusion "as to whether there is an 'affiliation, connection, or association' with another person." *Id.* at 905. "[T]he core element of trademark infringement law is whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product." *Id.* (internal citations and quotation marks omitted).

### 1. Probability of Success on the Merits

A claim of trademark infringement under the Lanham Act requires a plaintiff to prove ownership of a protectable trademark and a likelihood of confusion caused by the defendant's use of that mark. *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir. 1987). Defendants do not challenge the validity of Plaintiffs' trademark. The Court will therefore address only the likelihood of confusion.

In assessing the likelihood of confusion, the Eighth Circuit consistently considers the following six factors: (1) the strength of the trademark; (2) the similarity between the mark at issue and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent in using the mark; (5) incidents of actual confusion; and (6) whether the degree of purchaser care can eliminate the likelihood of confusion which would otherwise exist.

---

[2]Section 1125(a)(1) creates a cause of action against

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,....

*General Mills*, 824 F.2d at 626; *see also SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980). The test is not mechanical, but rather focuses on the ultimate question of whether, under all the circumstances, consumers are likely to be confused between the plaintiff's trademark and the allegedly infringing use. *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 399 n. 3 (8th Cir. 1987).

There is no dispute that Plaintiffs' trademark is strong and distinctive. Moreover, there is no dispute that Defendants used Plaintiffs' mark on the CardHub website and thus the marks being compared are identical. Accordingly, the first two factors, the strength of Plaintiffs' mark and the degree of similarity between the marks, weigh in favor of Plaintiffs.

There also is no dispute that the Plaintiffs and Defendants do not compete with each other. Plaintiffs describe First Premier as a bank specializing "in issuing unsecured credit cards to persons on the lowest end of the credit worthiness spectrum something in which, to the best of its knowledge, few other banks specialize." (Doc. 35, Reply Brief at 3.) Defendants are in the business of using an Internet website to compare and contrast credit cards for consumers, and collecting revenue from their affiliates and advertisers. This third factor weighs in favor of Defendants.[3]

The Defendants purposely used an "Apply Now" button in conjunction with Plaintiffs' trademark. Plaintiffs have not presented any evidence, however, that Defendants intended to cause consumers to be confused about whether the two companies are affiliated. In fact, it appears from the record that Defendants would prefer not to be affiliated with First Premier. Even though Plaintiffs sent three letters to Defendants complaining about trademark infringement prior to filing this lawsuit, there is no evidence that any other company has complained or that Defendants otherwise have been put on notice that use of company trademarks in conjunction with "Apply Now" buttons on the CardHub website causes consumer confusion as to affiliation. Defendants insist that it is not a trademark violation to use the "Apply Now" buttons on their website, and that the links simply make

---

[3]The Court is aware that direct competition is not necessary to a finding of likelihood of confusion. *See Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 774 (8th Cir. 1994) ("Confusion ... may exist in the absence of direct competition."). Nonetheless, whether Premier and Defendants are competitors is a factor to consider in assessing the likelihood of confusion.

it easier for consumers to reach their desired credit card application. The fourth factor concerning the alleged infringer's intent in using the mark favors Defendants.

Although Plaintiffs need not prove actual confusion to establish a likelihood of confusion, its existence is positive proof of the likelihood of confusion. *See Squirtco*, 628 F.2d at 1091. Plaintiffs have not provided the Court with any evidence of confusion. Since Plaintiffs have been accusing Defendants of trademark infringement since July of 2011, they have had enough time to gather such evidence. Thus the fifth factor regarding incidents of actual confusion weighs in favor of Defendants. *See, e.g., Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 626 (6th Cir. 1998) ("[T]he lack of evidence of actual confusion is not significant unless the circumstances indicated that such evidence should have been available."); *cf. Duluth News-Tribune, a Div. of Northwest Publ'ns, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996) ("[E]ven several isolated incidents of actual confusion that occur initially upon the creation of a potentially confusing mark are insufficient to establish a genuine issue of material fact as to the likelihood of confusion.").

"[T]he kind of product, its costs and the conditions of purchase are important factors in considering whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion which would otherwise exist." *SquirtCo*, 628 F.2d at 1091. As noted by the Eighth Circuit, this Court held in a previous trademark case that consumers tend to exercise a relatively high degree of care in selecting banking services. *See First Nat. Bank in Sioux Falls v. First Nat. Bank, S.D.*, 153 F.3d 885, 889 (8th Cir. 1998). Plaintiffs argue that their customers have bad credit and therefore some of them may not be the most sophisticated of consumers, but Plaintiffs offered no information regarding the sophistication of the potential or actual customers here, and the Court has no evidence to indicate that customers for sub-prime credit cards are any less careful than consumers of other banking services. Sub-prime credit card companies require their customers to pay very high fees and interest rates, and the Court concludes that sub-prime credit cards are the type of product that

9

requires a high degree of care by the consumer making a purchasing decision. This final factor involving the degree of purchaser care weighs in favor of Defendants.[4]

Balancing all of the relevant factors under the circumstances of this case, the Court finds that Plaintiffs have failed to show a likelihood of confusion as to affiliation. For this reason, Plaintiffs' have not shown a probability of success on the merits of their Lanham Act claims.

### 2. Irreparable Harm

The second *Dataphase* factor is the threat of irreparable harm to the movant absent the injunction.[5] In the Eighth Circuit, the lack of irreparable harm is a sufficient reason to deny a preliminary injunction. *Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992) (citing *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738 (8th Cir. 1989) (en banc)). According to Plaintiffs, First Premier's good will is harmed if a customer has a bad experience on Defendants' website or if a customer sees the wrong terms and conditions on Defendants' website prior to seeing the correct terms on First Premier's site. But this is supposition by Plaintiffs, and the record is devoid of evidence of harm to Plaintiffs.

Since this lawsuit was filed, Defendants have complied with Plaintiffs' demand that the "Apply Here" and "Apply Now" buttons be removed, and they agreed to keep it that way until this litigation is concluded. Plaintiffs admit that, at the present time, there is no likelihood of confusion about Plaintiffs' affiliation with Defendants. There is nothing for the Court to enjoin with respect to

---

[4]Plaintiffs contend the Court should accept as fact Plaintiffs' claim that when one website redirects consumers to a transaction page of another website, consumers believe that the second website compensates the first website for consummated transactions. There is no evidence in the record to support this presumption.

[5]The Court is aware of the Eighth Circuit's holding that, in trademark infringement cases, it is not necessary to prove actual damage or injury if likelihood of confusion has been established. *See Mutual of Omaha*, 836 F.2d at 403 n. 11. Because Plaintiffs failed to establish likelihood of confusion in this case, the Court is addressing the issue whether Plaintiffs face the threat of irreparable harm in the absence of an injunction.

Plaintiffs' trademark infringement claims. An adequate remedy in the form of a permanent injunction exists in the event Plaintiffs establish trademark infringement after full discovery and after the Court has had an opportunity to fully adjudicate the issues involved. Accordingly, the second *Dataphase* factor has not been established.

### 3. The Balance of Harm Between the Parties

The third *Dataphase* requirement is that the harm to the plaintiff in the absence of a preliminary injunction outweighs the potential harm that granting a preliminary injunction may cause to the defendant. *Dataphase*, 640 F.2d at 114. The essential inquiry in weighing the equities is whether the balance tips decidedly toward the movant. *General Mills*, 824 F.2d at 624. The evidence before the Court at this time shows that Defendants are not engaging in the allegedly infringing conduct, and the balance of harms to the parties is a neutral factor in this case.

### 4. The Public Interest

The final *Dataphase* factor requires the court to consider the public interest. Although trademark infringement is contrary to the public interest, Plaintiffs have failed to show that confusion among sub-prime credit card purchasers about First Premier's affiliation with Defendants is likely. Since fact questions exist on the issue whether consumers are likely to be confused, the public interest is better served by a full adjudication of the merits of Plaintiffs' Lanham Act claim.

After weighing all four *Dataphase* factors the Court finds that a motion for a preliminary injunction is not warranted on Plaintiffs' Lanham Act Claim.

### B. State Law Unfair Competition Claim

Under South Dakota law

[t]he tort of unfair competition does not have specific elements. Instead, "it describes a general category of torts which courts recognize for the protection of commercial interests." Therefore, damages for unfair competition result from satisfying the elements of an underlying tort.

11

*Setliff v. Akins*, 616 N.W.2d 878, 887-88 (S.D. 2000) (citation omitted). Plaintiffs assert that their unfair competition claim is established by their showing of the underlying trademark infringement. Thus, for the same reasons the Court denied Plaintiffs' request for a preliminary injunction on the Lanham Act claim, no preliminary injunction will be issued on the common law unfair competition claim.

### C. Breach of Contract Claim

The language of the termination clause of the contract on which Plaintiffs rely for their breach of contract claim provides: "Upon the effective date of termination of his Agreement, Operator shall remove all Banners from all websites maintained by Operator and/or shall cease sending e-mails promoting Bank's credit card products." "Banner" is defined by the contract as "a graphic message and any other information that appears on the computer screen when accessing the Operator's Website, or a graphic message that appears in a Link, 'pop-up' advertisement or exit console, promoting the Bank's credit card products or directing Traffic to Premier's Website." Plaintiffs allege that Defendant Evolution continues to promote First Premier credit cards on CardHub using banners in violation of the contract.[6] Evolution denies using banners in violation of the Agreement.

### 1. Probability of Success on the Merits

Under South Dakota law, to prove a breach of contract a plaintiff must show by a preponderance of the evidence that 1) an enforceable promise existed; 2) the defendant breached the contract; and 3) damages resulted from defendant's breach of the contract. *See*, *e.g.*, *McKie v. Huntley*, 620 N.W.2d 599, 603 (S.D. 2000).

The meaning of "banner" in the Agreement is of central importance to deciding if Evolution breached the contract. Under South Dakota law, a court must look "to the language that the parties used in the contract to determine their intention." *Pauley v. Simonson*, 720 N.W.2d, 665, 667-68 (S.D. 2006) (citation omitted). In doing so, a court must "give effect to the language of the entire

---

[6] Plaintiffs do not assert its breach of contract claim against Mr. Papadimitriou individually.

12

contract and particular words and phrases are not interpreted in isolation." *In re Dissolution of Midnight Star Enterprises, L.P.,* 724 N.W.2d 334, 337 (S.D. 2006). If the parties' intention is made clear by the language of the contract "it is the duty of this [C]ourt to declare and enforce it." *Pauley,* 720 N.W.2d at 668. "However, if the contract is uncertain or ambiguous, parol and extrinsic evidence may be used for clarification." *Id.* (internal quotations and citation omitted). "A contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* at 668 (citation omitted).

It is not clear from the language of the Agreement that "Banner" includes "links" and Defendants' written argument that a link is not a banner is reasonable.[7]  The Agreement, therefore, appears to be ambiguous. As a result, the Court should consider extrinsic evidence to determine which of the parties interpretations is the one on which they mutually agreed. At this juncture, there is not such evidence in the record for the Court to consider. Accordingly, Plaintiffs have not established, to the extent necessary to warrant a preliminary injunction, that Evolution breached the Agreement by using banners as defined by the contract. Thus, Plaintiffs have failed to show a probability of success on its breach of contract claim.

### 2. Threat of Irreparable Harm

Plaintiffs have not come forward with proof of the damages they allegedly have incurred or will incur as a result of Evolution's alleged breach of contract. Thus, Plaintiffs have failed to show a threat of irreparable harm.

---

[7]The Plaintiffs asked the Court to expedite the proceedings on the motion for a preliminary injunction, and the Plaintiffs' arguments at the hearing related solely to the trademark infringement claim.

### 3. Balancing of Harms

Plaintiffs have failed to show the balance of hardships tips decidedly in their favor. The Court finds that a delay in resolving the breach of contract claim until discovery is completed will not harm either party.

### 4. Public Interest Considerations

At this stage of the litigation, it is far from clear who will succeed on the merits of the breach of contract claim. Denying the preliminary injunction on the breach of contract claim will not harm the public interest.

For all of these reasons the Court will deny Plaintiffs' request for a preliminary injunction on the breach of contract claim.

Plaintiffs' motion for a preliminary injunction is denied as to all three claims asserted in the Complaint. This is without prejudice to Plaintiffs' right to seek a permanent injunction and damages after the parties have had the benefit of full discovery.[8]

## II. Motion to Dismiss Pursuant to Rule 12(b)(6)

In 2007, the United States Supreme Court clarified the standard to be applied when deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561-62 (2007). The Supreme Court held that a viable complaint must now include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level...." *Id.* at 555. The new standard is not a "heightened fact pleading" requirement, but "simply calls for

---

[8]The Court's findings of fact and conclusions of law regarding the motion for a preliminary injunction are not binding at a trial on the merits. *See, e.g., University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (the general rule is that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits," because courts must customarily decide preliminary injunction motions "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"); *accord Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995) (citing *Camenisch* for this general rule).

enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Id.* at 556, 570. The complaint must be liberally construed in the light most favorable to the plaintiff and should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations. *See id.* at 555. Moreover, when considering a motion to dismiss for failure to state a claim, a court must accept the facts alleged in the complaint as true, even if doubtful. *See id.* Thus, a well-pled complaint may proceed even if it appears "that recovery is very remote and unlikely." *Id.* at 556 (citations omitted).

In addressing the motion for a preliminary injunction, the Court described Plaintiffs' allegations in detail and those allegations will not be repeated here. Defendants offer several arguments that Plaintiffs' claims fail as a matter of law, including that Plaintiffs' claims are barred by the First Amendment. The question, however, at this early stage of the litigation is not whether Plaintiffs ultimately will prevail, but whether Plaintiffs have alleged sufficient facts in the Amended Complaint which, taken as true, create a plausible claim for relief. Plaintiffs' Amended Complaint contains allegations which, assuming they are true, could demonstrate that Defendants breached the Agreement and infringed on Plaintiffs' trademark, thereby causing harm. Thus, Defendants' motion to dismiss will be denied. Accordingly,

IT IS ORDERED:

1. That Plaintiffs' Motion for a Preliminary Injunction, doc. 4, is denied; and

2. That Defendants' Motion to Dismiss, doc. 27, is denied.

Dated this 7th day of January, 2015.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
DEPUTY

15